UNITED STATES of America

v.

Roland W. BROWN, Appellant.

No. 73–1826.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1974.

Decided Aug. 1, 1975.

Rehearing Denied Oct. 10, 1975.

Walter R. Choroszej, Washington, D. C. (appointed by this Court), for appellant.

Garey G. Stark, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and John E. Drury, III, Asst. U. S. Attys., were on the brief for appellee.

Before FAHY, Senior Circuit Judge, and WRIGHT and McGOWAN, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge FAHY.

Concurring opinion filed by Circuit Judge McGOWAN.

Statement filed by Circuit Judge MacKINNON, in which Circuit Judge TAMM joins, on denial of sua sponte suggestion for rehearing en banc.

FAHY, Senior Circuit Judge:

This appeal is from convictions of several related offenses under the narcotics laws.[1] Appellant was arrested March 25, 1969, on a warrant charging first degree murder. The principal evidence in support of the narcotics charges was obtained from a search of an apartment in an attempt to serve the arrest warrant a short time before the arrest was actually made. Appellant was not indicted on the narcotics charges until September 29, 1969, while in custody following the arrest. A superseding indictment was returned February 6, 1970, in which seven additional persons were charged with appellant for violation of those laws.[2] His trial on this indictment was not held until May, 1973, more than 4 years after the arrest. In the meantime the cases of the co-defendants had been disposed of, in three instances by dismissal of the indictment as to them for lack of a speedy trial.

Appellant's contentions are that the search referred to was unlawful, with the consequence that important evidence used to convict him was inadmissible, and, secondly, that he too was denied his right to a speedy trial.[3] We sustain the latter contention, and accordingly need not discuss the former.[4]

I

In computing the time lag before trial we think the starting point is the date of the arrest on the warrant charging murder, March 25, 1969, for it was in attempting to execute that warrant that the principal basis for indictment on the present charges was laid.[5] Several circumstances unavoidably contributed to the unusual delay. These include the preparation and trial of the murder case, an appeal from his conviction of second degree murder in that case, reversed by this court, an interlocutory appeal by the United States from an order of the District Court suppressing evidence in the present case, also reversed, and time devoted to determination of appellant's mental responsibility, which led to a bifurcated trial of that question as it affected the homicide case.

Notwithstanding delays incident to the history of the proceedings, we find that as the years passed time was available for trial of this case. Though well utilized no doubt for other purposes the total time became so extended as to

---

1. 26 U.S.C. § 4704(a) and 21 U.S.C. § 174.

2. The February 6 indictment charged appellant and seven others with violations of 26 U.S.C. §§ 4704(a), 4705(a), 7237(b) and 21 U.S.C. § 174.

3. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S.Const. Amend. VI.

4. As to the validity of the search, however, see, United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972).

5. Our decision would be the same were the starting point to be taken as the date of the indictment of September 29, 1969.

lead, in the circumstances to be reviewed, to denial of the constitutional right. Even unavoidable delay is not to be disregarded, though the reasons for it bear upon its weight in balancing the factors to be considered in deciding the issue. Among those factors is the special obligation of the United States to press the case to trial as the period of unavoidable delay mounts.

## II

We now outline the course of the proceedings.

The first phase of the homicide trial was promptly held following the arrest March 25, 1969. A verdict of guilty of second degree murder was rendered October 24, 1969. Before sentence, however, appellant on November 12, 1969, was committed on his motion to St. Elizabeths Hospital for mental examination. The hospital reported on April 8, 1970, that he was competent.[6] On May 25, 1970, however, the court, while finding him competent to stand trial, was not satisfied as to appellant's mental condition and ordered a bifurcated trial to determine the matter. This second phase of the trial for murder was not held for sixteen months after it was ordered. On the 22nd of September, 1971, it resulted in a finding that appellant was responsible. The murder conviction then became final. Appellant appealed and this court reversed[7] about 27 months later. The case was returned to

the District Court in January, 1974, for a new trial.[8]

█ From September 22, 1971, when the bifurcated trial was concluded, to May 24, 1973, when the present charges were tried, 20 months elapsed. During 7 of these months, from all that appears from the record, this case could have been tried. We reach this conclusion as follows: In June, 1970, appellant moved to suppress evidence.[9] His motion was acted upon April 12, 1971, when it was granted.[10] The United States appealed and this court reversed the suppression order September 13, 1972,[11] and denied rehearing October 12, 1972. As we have seen the appeal in the homicide case was then pending, and so continued well beyond the date of trial of the present case in May, 1973, seven months after termination of the litigation over the suppression order and 20 months after termination of the bifurcated trial. The case had already been pending more than 3 years when in October, 1972, the reversal of the suppression order became final, even if the time lag is considered to have begun as late as the return of the indictment in September, 1969.

The failure to bring the case to trial during the 7 months from October 12, 1972, to May, 1973, after so long a previous delay, is by no means the only reason for our concern. This apparently open period would have been substantially enlarged except for previous significant delays. Thus, appellant's motion to

---

6. This report obviously was limited to competency to be sentenced or for trial. It did not solve the problem of his mental responsibility for crime.

7. *United States v. Brown*, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973).

8. After the reversal appellant was permitted to plead guilty to manslaughter and on June 6, 1974, was sentenced to two to ten years, with credit for time served from March 25, 1969.

9. The government states in its brief that on March 25, 1971, appellant's motion to suppress was heard and that "[s]lightly less than three weeks later the trial court granted his motion." (p. 8). The docket entries, however, show that a motion to suppress the evidence

seized from the apartment was argued before the District Court June 17–19, 1970. The government submitted a brief on July 2, 1970 (Docket Entry 34) stating that it was in opposition to the motion to suppress evidence "SEIZED AT 1239 VERMONT AVE., N. W., APT. NO. 907", which is the place where the attempt to serve the arrest warrant occurred. Apparently the motion was argued again March 25, 1971, about 3 weeks prior to its grant by the court.

10. The District Court's order granting the suppression came down May 12, 1971.

11. A certified copy of the judgment of this court did not reach the District Court until November 9, 1972.

suppress evidence, argued first in June, 1970, was not acted upon until April 12, 1971, ten months later, when it was granted, leading then to the interlocutory appeal. That appeal no doubt would have been terminated prior to October 12, 1972, had the motion to suppress been more promptly decided, which would have significantly enlarged the open period of seven months to which we have referred. Moreover, as we have shown, the total time consumed in reaching a final disposition of the motion to suppress was 2 years and 4 months, ranging from June, 1970 to October 12, 1972. The narcotics case had then been pending 3 years and 1 month from the date of the indictment in September, 1969, and 3 years and 7 months from the date of the search and arrest March 25, 1969. The period thus consumed is excessive considered alone, aside from its contraction of the period of free time which otherwise would have been available to try this case during the pendency of the appeal in the homicide case.

Promptly after appellant lost the favorable decision of the District Court suppressing evidence, he moved on October 31, 1972, for dismissal of the indictment for want of a speedy trial, urging prejudice in having to proceed, for "having been in jail [he] has lost contact of some or all of his potential witnesses; some . . . are no longer in this jurisdiction or have passed away during the delay of the last four years." The motion appears not to have been heard until May 9, 1973. On that date counsel again argued, *inter alia,* that after "four years" there was "absolutely no way, Your Honor, that I can possibly have any kind of a defense, any witnesses as far as protecting the rights of my client." He named two witnesses who had once been but now were no longer available to testify, a man nicknamed

"Little George" who had since died, and Nadine Frazier, the woman whose apartment was searched on the date of appellant's arrest in March, 1969.[12]

Counsel also pointed out that the court had already dismissed for want of a speedy trial the indictment against three co-defendants included in the superseding indictment of February 6, 1970, upon which appellant was to be tried. The court, in denying appellant's motion, pointed to the difference in appellant's case from the others, due to the fact that the murder case was also to be disposed of. The judge stated that the Court of Appeals would not have permitted him to have allowed the prosecutor to harass counsel for defendant by forcing this case to trial, presumably while the murder case was pending. But, as we have seen, the bifurcated trial of the murder case had been concluded September 21, 1971, and this motion to dismiss was being argued May 9, 1973, nineteen months later.

### III

As we analyze the rather complicated proceedings, the period of approximately four years is attributable primarily to the operation of the system. Although differences of opinion may be justified as to whether any substantial part of the delay should be placed at the door of appellant, we think very little can be placed there. The time devoted to observation and examination of appellant's mental condition, not a great deal compared with the total, was due to the operation of the system rather than to any "fault" of appellant. So too the period consumed by the interlocutory appeal.[13] Indeed, we find no evidence of intentional delays on the part of either the prosecution or the appellant. Yet we think that upon consideration in

---

12. Nadine Frazier appeared as a government witness at the trial.

13. We note, however, that since that appeal this court has made a salutary rule looking toward expedition of interlocutory appeals, including a provision that "The Clerk shall schedule the case for argument promptly after the briefs are filed." Amendment to Rule 7, General Rules of the United States Court of Appeals for the District of Columbia Circuit ((c)(1)(iv)).

more detail of the relevant factors the United States failed to meet its obligation to encompass all the proceedings within a pretrial span of substantially shorter duration than four years.

## IV

■ The four principal factors to be balanced, as enumerated in *Barker v. Wingo,* 407 U.S. 514, 530–32, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), are (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. We note preliminarily, however, that these four factors are to be considered in light of certain general principles:

A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process. Moreover, for the reasons earlier expressed, society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest. . . . [T]he rule we announce today, which comports with constitutional principles, places the primary burden on the courts and the prosecutors to assure that cases are brought to trial. (Footnotes omitted.)

*Id.* at 527 and 529, 92 S.Ct. at 2190.

■ The right to a speedy trial is "one of the most basic rights preserved by our Constitution." *Klopfer v. North Carolina,* 386 U.S. 213, 226, 87 S.Ct. 988, 995, 18 L.Ed.2d 1 (1967); *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).

. . . [T]he longer the time between arrest and trial, the heavier the burden of the Government in arguing that the right to a speedy trial has not been abridged.

\* \* \* \* \* \*

The passing of . . . a considerable length of time, no matter who is "at fault," should act as a spur to the Government to seek prompt trial.

*Hedgepeth v. United States,* 124 U.S. App.D.C. 291, 364 F.2d 684, 687–88 (1966). Though the circumstances in *Hedgepeth* were held not to violate the right to a speedy trial, the court there repeated that a claim of its denial has prima facie merit when more than a year elapses between arrest and trial. See to that effect, *United States v. West,* 164 U.S.App.D.C. 184, 186, 504 F.2d 253, 255 (1974); *United States v. Calloway,* 164 U.S.App.D.C. 204, 505 F.2d 311 (1974), and cases there cited.

. . . in Barker v. Wingo, *supra,* the Supreme Court said that in weighing delay in trial, overcrowded Courts should be weighed less heavily (than Government's deliberate attempt to delay) "but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."

*United States v. Perry,* 353 F.Supp. 1235, 1238 (D.D.C.1973).

While the Court in *Barker v. Wingo, supra* 407 U.S. at 523, 92 S.Ct. at 2188, stated that it found "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months", it noted in passing the following developments in that regard:

The United States Court of Appeals for the Second Circuit has promulgated rules for the district courts in that Circuit establishing that the government must be ready for trial within six months of the date of arrest, except in unusual circumstances, or the charge will be dismissed.[18] This type of rule is also recommended by the American Bar Association.[19]

[18] Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (1971).

[19] [Omitted.]

*Id.*

In *United States v. Marion,* 404 U.S. 307, 312 n. 4, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971), the Court also had

noted that Federal Rule of Criminal Procedure 48(b) authorizes dismissal of an indictment, information, or complaint "[i]f there is unnecessary delay . . . in bringing a defendant to trial . . .."

Turning now to the balancing process to be engaged in, the first factor stressed in *Barker v. Wingo, supra,* the length of the delay, weighs in favor of appellant's claim, for the over-all delay was inordinate. Passing over momentarily the second factor, the reason for the delay, we consider the third, the assertion of the right. This too weighs in appellant's favor. Nothing indicates any desire on his part to delay the trial.[14] He first moved May 18, 1971, that the indictment be dismissed for lack of a speedy trial, complaining of the delay of the United States in appealing from the suppression order. Appellant again moved to dismiss for lack of a speedy trial October 31, 1972, and brought the matter up again May 9, 1973, citing, *inter alia, United States v. Perry, supra.*

The second factor concerns the reason for the delay. Our outline of the proceedings has indicated the principal reasons for the delay of approximately four years, other than those which do not appear in the record of this case. We have pointed to the seven-months open period from October, 1972 to May, 1973, and to the fact that it would have been substantially enlarged except for the periods which elapsed before the motion to suppress was acted upon and finally disposed of, a total period of 2 years and 4 months. We have difficulty in finding that any significant part of the inordinately long lapse of time between arrest—or indictment—and trial, can be charged to appellant.

We come then to the fourth factor, that of prejudice to the defendant. His prejudice of a personal character is clear. This kind of prejudice, though not the same as that caused by the death of a witness or other loss of evidence, which may include loss of the memories of witnesses, is firmly established as important.

In *United States v. Marion, supra* 404 U.S. at 320, 92 S.Ct. at 463, the Court stated:

. . . the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense.

Moreover, it occurs independently of incarceration, though it is aggravated thereby. In that regard the Court in *Marion* stated:

Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

*Id.* In *Barker v. Wingo, supra,* Mr. Justice Powell stated for the Court:

. . . even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.

407 U.S. at 533, 92 S.Ct. at 2193. In the earlier case of *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966), one of the elements of the constitutional guarantee is stated to be "to minimize anxiety and concern accompanying public accusation." See, *Klopfer v. North Carolina, supra,* and also, *Smith v. Hooey, supra,* where the Court stated:

. . . this constitutional guarantee has universally been thought essential to protect at least three basic demands of criminal justice in the Anglo-American legal system: "[1] to prevent undue and oppressive incarceration prior to trial, [2] to minimize anxiety and concern accompanying public accusation and [3] to limit the possibilities

---

14. In *Barker v. Wingo, supra,* the Court excused a delay of over five years in a brutal murder case because of the absence of significant prejudice, and, importantly, because the accused did not want an earlier trial for tactical defense reasons.

that long delay will impair the ability of an accused to defend himself." *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627. (Footnote omitted.)

393 U.S. at 377–78, 89 S.Ct. at 577.

This court has adverted to the matter as follows:

> . . . these provisions [those of the Constitution and Rule 48(b) F.R. Crim.P.] seek to minimize the anxiety and attendant evils which are invariably visited upon one under public accusation but not tried. (Footnote omitted.)

*Hanrahan v. United States,* 121 U.S.App. D.C. 134, 348 F.2d 363, 367 (1965).

■ Though we cannot measure in an accurate manner the degree of personal prejudice to appellant, we cannot ignore it; and it was aggravated by appellant's incarceration, though that was due to the murder case as well. This aggravation is clear from *Smith v. Hooey, supra.* There Smith, while a prisoner in a federal penitentiary, was indicted by the State of Texas for a state offense. For six years he vainly sought a trial by Texas. The Texas court deemed itself to be without power to act to bring him to trial on the state charge because he was held by a different sovereign, stating, " '[t]he true test should be the power and authority of the state unaided by any waiver, permission or act of grace' " of any other authority. 393 U.S. at 377, 89 S.Ct. at 576. The Supreme Court held, however, that the petition of Smith to require the State by mandamus to make a diligent, good faith effort to bring him to trial on the state charge should be granted. The Court stated:

> At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from "undue and oppressive incarceration prior to trial." But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge.

First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. Secondly, under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him.

> And while it might be argued that a person already in prison would be less likely than others to be affected by "anxiety and concern accompanying public accusation," there is reason to believe that an outstanding untried charge (of which even a convict may, of course, be innocent) can have fully as depressive an effect upon a prisoner as upon a person who is at large. Cf. *Klopfer v. North Carolina, supra,* 386 U.S. at 221–222, 87 S.Ct. [988] at 992–999. In the opinion of the former Director of the Federal Bureau of Prisons,

> "[I]t is in their effect upon the prisoner and our attempts to rehabilitate him that detainers are most corrosive. The strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities. His anxiety and depression may leave him with little inclination toward self-improvement."

> \*   \*   \*   \*   \*   \*

> And, while "evidence and witnesses disappear, memories fade, and events lose their perspective," a man isolated in prison is powerless to exert his own investigative efforts to mitigate these erosive effects of the passage of time. (Footnotes omitted.)

*Id.* 398 U.S. at 378–80, 89 S.Ct. at 577.

We do not ignore but neither do we emphasize appellant's claim of prejudice

due to his inability to defend against the narcotics charges as urged by his counsel in the trial court. He did not testify and called no witnesses in the two-day trial. Perhaps a court would be justified in assuming some prejudice to an accused's defense due to such a delay, accompanied by incarceration, but we do not make such an assumption in this case. The factor of prejudice, however, does weigh in favor of appellant's claim of denial of a speedy trial, because of the personal prejudice of which the Supreme Court has spoken in the cases to which we have referred.

## V

As we have seen, the period during which the case was pending before trial was substantially entangled with the homicide case involving appellant. Unavoidable difficulties confronted the trial court in bringing the narcotics case to trial. Moreover, even during what we refer to as an open period, when it ap-

pears the case could have been tried, and which we think could have been expanded as has been explained, we know the trial court was well occupied in other respects. There was a heavy case load of which this case was but a part. We would not be justified in implying criticism of the trial court or the prosecution; we cannot reconstruct the overall situation, or isolate any delays as due to neglect or design on the part of those responsible for bringing the case to trial. Yet the burden of responsibility was not met in the particular case, with the consequence that, in balancing the relevant factors to be considered, we conclude the constitutional right requires enforcement by dismissal of the indictment.[15]

*It is so ordered.*[16]

McGOWAN, Circuit Judge (concurring):

I concur in the judgment and in Judge Fahy's opinion, but wish to add a word

---

**15.** We deem it of some importance in reaching our decision that the District Court, in line with a general trend in the judiciary to make the right to a speedy trial more effective, notwithstanding its elusiveness, has promulgated for its own guidance a rule which includes the following:

> All indictments returned shall be tried within 180 days from return of indictment if the defendant is on bond. . . . The United States or the defendant may, for good cause shown, petition the judge to whom the case is assigned to extend the time period applicable to the particular case. In exceptional cases the court may, sua sponte, order an extension.

Rule 2–7(d)(1).

**16.** The following comments are addressed to Judge MacKinnon's Statement:

The Statement says, and repeats, that Brown's counsel did not claim prejudice. However, he sought dismissal of the indictment at the hands of the District Court for lack of a speedy trial, and urged in this court reversal because of the denial of a speedy trial. Thus it became necessary for this court to consider the question of prejudice as appellant's brief explicitly stated.

The Statement then designates by numbers a summary of criticisms of the court's opinion. In commenting upon these criticisms I do so in the same numbered order as the summary.

1. The reference to the failure of the opinion to discover or consider the pendency of a third major indictment fails to indicate anything of significance to the issue of a speedy trial in this case. *And see* footnote 2 of Judge McGowan's concurring opinion.

2. The objection to the opinion's "open period" aspect of the case will be considered *infra* with other criticisms of that part of the court's opinion.

3. Contrary to the conclusion the Statement draws, there is nothing in the record respecting a request by Brown's counsel that the trial judge defer trial of this case because of counsel's responsibility to argue the appeal in the murder case. The trial judge's statement to Brown's counsel, quoted in the Statement as though it indicated such a request, is silent as to the argument of the appeal. Nowhere in the record of the hearing on May 9, 1973, referred to in the Statement, is there mention of delaying or deferring this case on account of counsel's need to prepare for the appeal in the murder case. See, *infra,* the discussion of the argument of the appeal in that case as it bears upon the "open period" during which it occurred.

4. Comments upon this objection are also deferred to consideration of the "open period" phase of the opinion, *infra.*

5. The Statement is mistaken in suggesting that the opinion fails to recognize the periods involved in the "trial" to determine appellant's

sanity as that phase of the proceeding might bear upon the issue of a speedy trial. The opinion correctly states the facts in that regard and reaches its conclusion with due regard to those facts. *And see* footnote 2 of Judge McGowan's concurring opinion.

6. Assuming, as the Statement says, that appellant was given the choice of having this case tried immediately with his murder case, but elected to have this case delayed, the facts are that the murder case was fairly promptly tried, in October 1969, while this case was not tried until May 23, 1973, 4 years and 2 months after the arrest and 3 years and 8 months after the indictment. Several times after the murder case had been tried appellant's counsel moved to dismiss this case because of the delay.

7. As stated above, the issue of prejudice was *ex necessitate rei* considered by the court in response to the issue of a speedy trial raised by Brown's counsel. See, also, Judge McGowan's discussion of certain specific claims of prejudice by Brown's counsel.

We turn now to the several related portions of the Statement respecting the "open period", including paragraphs numbered 2 and 4 of the summary, noted above as deferred for comment. The Statement strongly challenges the court's position that from what appears on the record this case could have been tried during that period. The Statement contends it could not have been tried then because the appellate argument in the murder case was set for the middle of the period. The facts are as follows: Brown's counsel had filed his brief on the appeal August 2, 1972. The "open period" began October 12, 1972 (or a month later if it should be thought to have begun when the mandate issued on the appeal from the suppression order). Appellant's brief accordingly was filed two or three months before the open period began. The appeal was argued February 22, 1973, after the open period had been running more than three or four months, depending upon when one considers it to have begun. When this case was tried May 23–24, 1973, the defense placed no witnesses on the stand, and the trial consumed one and a half days of trial time, some 5–6 hours altogether. Obviously this case could have been tried during the open period without unfairness to Brown's counsel notwithstanding he needed to prepare for a half hour or so argument of the appeal between August 2, 1972 and February 22, 1973.

Notwithstanding other objections of the Statement to the open period phase of the court's opinion, which are not in all respects without substance, we remain unconvinced, especially in light of the excessive delays which had already occurred when this period began, after the controversy over the validity of the suppression order had ended.

Any doubts created by the challenge of the Statement to the court's treatment of the open period are removed by the court's treatment of the case as a whole on the issue of a speedy trial. The Statement is mistaken when it insists that the court's position is that the narcotics case "must be reversed and the indictment dismissed because appellant was not brought to trial during the open period of 'seven months' (Initial Opinion, p. 6) beginning on October 12, 1972 and running through to May 23, 1973." The Statement mistakenly states the position of this court. So, too, does the Statement as it continues: "This is the critical period since the opinion pointed to no other specific period of allegedly unnecessary delay. * * * It is thus the ruling with respect to this seven-month period, which the court in effect states controls its disposition of this case, that must be examined to see if the Government was delinquent in not bringing Brown to trial *earlier in this period.*" (Emphasis in Statement.)

The answer to this position of the Statement—that the open period of seven (six) months was the all-in-all basis for the decision that a speedy trial had been denied—is contained in the text of the opinion. Immediately following its consideration of the open period, the opinion states:

The failure to bring the case to trial during the 7 months from October 12, 1972, to May, 1973, after so long a previous delay, is by no means the only reason for our concern.

We then proceed to consider previous significant delays but for which the apparently open period "would have been substantially enlarged." The importance of the ensuing analysis of the progress of the case is fully developed by Judge McGowan's concurring opinion, which demonstrates the soundness of the conclusion that appellant was denied a speedy trial.

Not among the numbered objections stated in summary form, but in the body of the Statement, it is said that the court's opinion improperly seeks to extend the period for which the Government must account on the speedy trial claim to include time "*after* the date the case was tried," and "This approach is beyond belief." The Statement is again mistaken. The opinion contains a narrative reference to the total time the appeal pended in the murder case, but no time calculation in the court's disposition of the speedy trial issue includes any time subsequent to the trial of this case on May 23, 24, 1973.

Society's interest in a speedy trial, given constitutional status by the Sixth Amendment, has recently led to the Speedy Trial Act of 1974 (Public Law No. 93–619), effective July 1, 1975, which is mentioned in the Statement. The Act is designed "to assure a speedy trial." 18 U.S.C. § 3161 *et seq.* This Act contains time periods of limited duration within which

of emphasis on an aspect of the case that I find particularly compelling. That is the fact that, given the Supreme Court's holding in *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), that the speedy trial guarantee is not suspended by contemporaneous incarceration on another charge, it took an unconscionable amount of time—without any particular fault other than the system as it then worked—to dispose finally of appellant's pretrial motion to suppress. In short, I consider this case similar to *United States v. Perry,* in which we upheld the dismissal of an indictment because of a similarly long delay in the disposition of a suppression motion. 353 F.Supp. 1235 (D.D.C.1973), affirmed by order of this court entered on December 12, 1973.

The salient facts on this score are that on June 17, 1970, promptly after appellant had been found competent to stand trial, he moved to suppress the narcotics evidence on which his conviction ultimately rested. That motion was argued and taken under advisement two days later, but it was not finally disposed of by the trial court until April 12, 1971—10 months after filing. The motion was granted, and the Government appealed. It was not until November 9, 1972 that a mandate issued from this court reversing the trial court's suppression of the evidence. Thus the time required for final disposition of the suppression motion ran from June 17, 1970 until November 9, 1972—2 years and 5 months.

It is this period of delay, rather than the seven months immediately before trial, that I find unacceptable. That such a

delay in the courts may lead to dismissal for lack of speedy trial the Supreme Court made clear in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972):

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. [citation omitted] A more neutral reason such as . . . overcrowded courts should be weighted less heavily but *nevertheless should be considered, since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.*

*Id.* at 531, 92 S.Ct. at 2192. (emphasis supplied). Our case may indeed be *a fortiori* after *Perry,* in which we found excessive a similar delay of only a little more than two years. *See* 353 F.Supp. at 1236–37.

In his statement of reasons for seeking an *en banc* rehearing of this case, Judge MacKinnon makes several relevant objections. He would excuse the major part of the delay in the trial court on the ground that the suppression movants did not file their last brief there until March 30, 1971. Briefs opposing and supporting the suppression motion were initially filed in July and August of 1970. The later brief to which Judge MacKinnon refers was the last in a round of "supplemental memoranda" filed by both the defendants and the Government, and occasioned by the District Court's having scheduled a second suppression hearing for March 25, 1971. In the intervening months, it appears that the parties had been awaiting action by the court, and not vice versa.[1]

proceedings in criminal cases are to take place. Such a period is prescribed, for example, within which trial is to occur subsequent to arraignment. To enable the District Court to comply with the limited periods prescribed, delay necessarily encountered by, for example, an interlocutory appeal, is excluded. The trial of the case before us, however, was concluded in the District Court long before the inauguration of this legislative effort to help solve the speedy trial problem. Our decision accordingly rests upon the Constitution, and since the

Constitution contains no time tables such as appear in the Speedy Trial Act of 1974, it does not require the court to disregard any specific delay except as it should rationally be appraised as not fairly to be weighed in support of the claim of denial of this "fundamental" yet "more vague concept than other procedural rights." *Barker v. Wingo, supra,* 407 U.S. at 515, 521, 92 S.Ct. at 2187.

1. Suppression was sought on the ground that the police had illegally entered the apartment in which they found the evidence of narcotics

Nor is appellant responsible for the delay in the appellate consideration of the suppression matter. To the contrary, the certified record in this case was filed on June 19, 1971, the Government's brief in support of its appeal was filed on September 24, but counsel was not appointed for appellant by this court until November 15, in an order extending time to file brief to December 25. Thereafter, appellant, not the Government, made a motion on March 2 to accelerate oral argument, which was denied.[2]

As to the existence of prejudice, it is true, as Judge MacKinnon says, that the trial judge's eventual action in making Brown's narcotics sentence run from the date when he was first arrested for murder eliminated the possibility of his having to serve additional time in prison because of the delay. Thus, we do not have the problem, identified in *Smith v. Hooey,* that delay in trying an already-incarcerated prisoner may deny him the benefit of concurrent sentences, although it perhaps remains true that appellant's

violations. The defendants' initial supporting memorandum, filed August 27, 1970, advanced only the argument that the entry had been illegal because the police lacked probable cause to believe that the object of their search (Brown himself) was in the apartment. This tack was evidently taken because the Government had to date proffered no evidence of such probable cause, relying instead on the existence of an arrest warrant for Brown, and on a mere allegation that the police had information as to his whereabouts. The defendants filed their first supplemental memorandum on March 25, 1971, the date of the second suppression hearing. Their stated reason for doing so was that the Government was to be permitted in that hearing to adduce evidence of the existence of probable cause. This necessitated a shift by defendants, made in their supplemental memorandum, to the theory that even if probable cause existed, the entry was nonetheless illegal because a search warrant had not been obtained. We are thus left with the question of why, assuming a second suppression hearing was necessary at all, it was so long in coming. If the record does not fully disclose the cause of delay, it at least makes clear that it was not the tardy filing of briefs.

2. Judge MacKinnon has emphasized, as mitigating the delay, the pendency during this period of two other prosecutions, one for murder and one for a separate narcotics offense. He argues in particular that on September 14, 1971, Brown was given a bifurcated trial which determined his mental responsibility for all three crimes. He asserts that this trial was the first phase of Brown's trial for the instant offense, and hence that we need only consider the delay that occurred up until that time.

I cannot agree. A joint bifurcated trial was apparently planned (the District Judge so ordered on June 19, 1970), but in fact never took place. For reasons not apparent from the record, the bifurcated trial in September of 1971 concerned Brown's responsibility for murder only. Judge MacKinnon considers that the verdict at this trial was "also determinative of competency with respect to the narcotics offense," Statement at 22, and by this I

take it he means mental responsibility for the narcotics offense, rather than competency to be tried for it, the latter having been found many months earlier in May of 1970. Manifestly, however, a defendant's mental responsibility for one offense and his mental responsibility for another are two separate issues which, if they are raised, must be separately tried. In fact, appellant never did raise this defense to the narcotics charge, quite possibly because it simply did not seem likely to succeed. If what Judge MacKinnon is suggesting is that he was precluded from raising it by a promise to abide by the verdict in the bifurcated murder trial, the answer is that, even assuming that such a promise would be enforceable, it is hardly to be inferred from the appellant's mere failure to object to the ambiguous suggestion of a "consolidated" mental responsibility trial.

If the bifurcated murder trial was not itself the beginning of the appellant's narcotics trial, then neither did it excuse the delay that took place before that trial actually was begun. The bifurcated murder trial took place a year and four months after Brown's competency was determined. The appeal in that case was argued a year and five months later still. Time could have been found for the narcotics trial. Such, plainly, was appellant's wish, since he first asserted his right to a speedy narcotics trial long before the bifurcated trial took place. We must assume, then, that the narcotics trial would have proceeded but for the suppression motions. And it was not the bifurcated murder trial which caused the delay in disposing of those motions; the trial judge eventually granted them months before the bifurcated trial was scheduled to take place.

The pendency of a second narcotics prosecution is even less of an excuse. Brown's competency to stand trial for that offense was likewise found on May 25, 1970. His mental responsibility for it was likewise committed to, and then omitted from, the bifurcated murder trial. Nothing further transpired in that case except for Brown's motion for speedy trial dismissal on October 31, 1972, and the Government's motion to dismiss (this one granted) on February 16, 1973.

anxieties on this score could have been very real and prolonged, since he had no way of knowing that the trial judge was eventually going to extend the favor he did.

The second possible source of prejudice mentioned in *Smith v. Hooey* is the general anxiety that a prisoner incarcerated on one charge may suffer from having an undisposed indictment for another pending at the same time. Judge MacKinnon discounts this, apparently because he considers that appellant was a fairly hardened criminal. The Supreme Court at least did not distinguish between defendants on the basis of a subjective appraisal of their possible emotional states, and we cannot either.

The third kind of prejudice pointed to by the Supreme Court in *Smith v. Hooey* was the impairment of the accused's defense. This question came up when appellant's speedy trial motion of October 31, 1972 was finally heard on May 9, 1973—two weeks before the trial started. The entire colloquy on the speedy trial issue at that hearing is as follows:

MR. CHOROSZET (Brown's counsel): . . . I represent to this Court, Your Honor, that on the 23rd I cannot conceive of having any potential witnesses that have appeared.

THE COURT: What witnesses did you have on May 12, 1971?

MR. CHOROSZET: Well, there was, as I recall, a man by the name of, I think his nickname was Little George. He died. He appeared before you a number of times.

THE COURT: I can't control his death. You wouldn't have him here anyhow.

Now, who else? You had a list of witnesses, you say?

MR. CHOROSZET: I had Nadine Frazier. I have no idea where this lady is today.

THE COURT: Go ahead.

MR. CHOROSZET: I don't know whether Mr. Westbrook will appear in the course of this case or not.

THE COURT: That is for you to determine, counsel. Mr. Westbrook has entered a plea in this case and his address is a matter of record in the probation office of this Court. He is in Atlanta, Georgia, as you well know.

So there is no question about where Mr. Albert Westbrook is. There is no question you were sitting right there in the room, because we have got a statement where he was. We have got his picture there.

MR. CHOROSZET: In any event, Your Honor, as far as I know, on the 23rd, if the Court will proceed with the trial of this case, we take the position that the defendant has been in jail for a period of the last four years.

THE COURT: Now, counsel, he is not in jail on this case. He is in jail because he was convicted of second degree murder.

MR. CHOROSZET: That is correct, Your Honor. But he has been in jail at the time of the arrest and charge in this case, murder case, and the Austin case.

THE COURT: Well, unfortunately, we have defendants who don't choose to stop at one felony. They go on and on. If I were to dismiss—I could clean up my calendar in 15 minutes by dismissing cases where there are multiple indictments against defendants. If they would stop at one bank robbery, fine. But they don't, counsel.

MR. CHOROSZET: Well, Your Honor, the Government does impliedly concede—

THE COURT: There is no point in us getting involved in an extensive discussion. I intend to deny all defense motions for dismissal of this indictment for lack of speedy trial in this case.

Judge MacKinnon in his statement notes that Nadine Frazier, in the event, testified at the trial as a witness for the Government; and that no effort was made to bring Mr. Westbrook from Atlanta to testify. There is still a gap, however, with respect to the witness

who was said to have died, Little George, a matter which the trial court disposed of with the comment, "I can't control his death. You wouldn't have him here anyhow."[3] This abrupt treatment, joined with the seeming disregard of the teaching of *Smith v. Hooey* that persons lawfully imprisoned for one offense retain speedy trial rights with respect to others, at least leaves a lingering question as to how carefully appellant's suggestion of prejudice was examined.

We need only find a "reasonable possibility" of this kind of prejudice, *United States v. Rucker,* 150 U.S.App.D.C. 314, 316, 464 F.2d 823, 825 (1972), and I am inclined to do so in this case. Appellant in his brief names two other witnesses, Theodore Moore and George Stewart,[4] who would be potentially useful to him but are now unavailable.[5] Appellant's case for impairment is admittedly not a strong one, but that case may itself have been impaired by the passage of time. We should not forget that more than four years had passed since the events as to which counsel claimed he could not assemble a proper defense.

As to the appellant's assertion of his right to a speedy trial, I note that he formally moved for dismissal on that ground at least four times. The first of

these was on May 18, 1971, shortly after the trial judge had ordered suppression of vital Government evidence. Since he had, for the moment at least, prevailed, it was perhaps not his obligation to make such a motion at all, and the court appears to have taken no notice of it. In any case, Brown's next motion came on October 31, 1972, promptly after this court had reversed the suppression order and denied rehearing *en banc.*[6]

Speedy trial issues are among the most unsatisfactory of those which appellate courts are called upon to determine. In a record as tangled as this one, the speedy trial question is, to use the Supreme Court's characterization in *Barker v. Wingo,* more "slippery" than usual.[7] The balancing mandated by *Barker* may be more than normally difficult on this record, but where the overall period of delay is more than four years, two years and five months of which are devoted to a suppression question, I must resolve my doubts in favor of the defendant.

### Statement of Reasons in Support of *Sua Sponte* Motion to Consider the Case *En Banc*

MacKINNON, Circuit Judge:

The motivation for this Statement comes from the exercise of what in my

---

**3.** Judge MacKinnon assumes that by the latter comment the trial judge meant that Little George was a poor witness even when he lived. Statement at 19. He cites no evidence in the record either that this was the trial judge's thought, or that he was justified in so thinking.

**4.** Conceivably "Little George" and George Stewart are one and the same. On this, as on so many points, the record is lamentably unclear.

**5.** Br. 6. The allegation appears in appellant's statement of facts rather than in the section entitled "Argument." Still, I do not think we are relying, as Judge MacKinnon charges, on a kind of prejudice that appellant has not alleged. I would not think it significant even if we were. It must be clear by now that we cannot possibly reach a proper result in this tangled and difficult case without an independent examination of the record. Nothing proves this as conclusively as Judge MacKinnon's own exegesis of the record, in the course

of which he relies on any number of points not made in the Government's brief.

**6.** On February 27, 1973, appellant moved again for dismissal for lack of a speedy trial. He renewed the motion on May 9, 1973. In this connection, I cannot attach the same significance as does Judge MacKinnon to the fact that in October of 1969, after his indictment for both murder and this narcotic offense, but before his trial for either, appellant requested that the two trials be separate, that for murder to come first. What he might reasonably have expected was that after the murder trial was completed, the narcotics trial would then proceed with reasonable dispatch. The murder trial was over in October of 1969. The narcotics trial could have gone ahead in the spring of 1970, as apparently it would have but for the June suppression motions. It is the delay in deciding those motions to which I object, and I cannot see how Brown's earlier request for two trials disqualifies him from objecting also.

**7.** 407 U.S. at 522, 92 S.Ct. at 2182.

opinion is a gross abuse of appellate judicial power. The Statement deals with Judge Fahy's opinion (the "initial opinion") to which it was first addressed, and then with the "concurring opinion" which was added after this Statement had dealt with the 7-month period upon which the initial opinion primarily based its decision. Thereafter, footnote 16 was added to the initial opinion to deal with some of the comments this Statement had added following the issuance of the concurring opinion. The footnote, which has a surface acceptability on a casual reading, will not stand sound analysis.

Actually, what the panel opinions do here is to require the impossible.

It is not humanly possible where a defendant is guilty of as many separate *major* crimes as Brown, involving as many defendants as he was involved with, for any trial court to (1) let a defendant select one counsel to represent him in all cases, including appeals, (2) grant all the severances, continuances, hearings and separate trials this court requires and the defendants request, (3) permit defense counsel to select the order of trial and allow all the time he demands to prepare for and handle the trials and interlocutory appeals, and still comply with our due process requirements within the compressed time frame that the foregoing opinions are here requiring under the guise of right to a speedy trial. In other words, there comes a time when the demands of due process and the requirement of a speedy trial may conflict. This is such a case, and the lawyer whom Brown insisted defend him in all these cases is to be commended for his highly ethical conduct in *not* claiming any prejudice here.

In my view *en banc* consideration of this case is called for because of the importance of the issues raised and because both prior opinions overlook controlling facts and misapply the principles laid down in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and

*Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). Consideration by the full court is thus necessary to maintain the uniformity of our decisions. Fed.R.App.P. 35(a).

To summarize some of my principal objections to the opinion:

1. It fails to discover or consider the pendency of a third major indictment (Narcotics I) that was pending throughout the pretrial period.[1]

2. The seven-month "open period" that the opinion finds should have been used to try this case was not "open" at all because the argument on the appeal of the murder conviction was set for the middle of the period.

3. Appellant's counsel, who represented him on all three indictments, in the trial court and on appeal (two cases), had requested the court to defer the trial of this case until he could argue the appeal of the murder conviction. The opinion fails to consider this.

4. It fails to consider that Brown and his counsel on February 27, 1973, filed several motions in the middle of the "open period" that had to be decided before trial.

5. It fails to recognize that appellant was first brought to "trial" on this case to determine the issue of his sanity and that a portion of appellant's trial thus began over 20 months before the date the opinion ascribes to the beginning of the trial.

6. It fails to recognize that immediately after he was indicted, Brown was given the choice of having his case tried immediately with his murder case, as the Government had a right to do, but he elected with his eyes open to have this case delayed. That is undoubtedly the reason he never claimed any prejudice.

1. The Government dismissed this indictment after the murder conviction and just prior to the trial of this case. It apparently considered that punishment on two offenses (murder and Narcotics II) would be sufficient to serve the ends of justice.

7. Even its weak finding of prejudice is unsupported by the record and raises a claim of prejudice which appellant did not raise on appeal.

8. The opinion contains other oversights and improper applications of law, fact and logic.

My reasons for voting to en banc the case are further set forth below.

## I. Factual Background

In 1968, Roland W. Brown, also known as "Rabbit," was a large-scale narcotics distributor in the District of Columbia.[2] His criminal practice was to consign narcotic drugs to several pushers and later collect the money from them after the drugs were sold. One Ricardo Parks was such a pusher for Brown. Because Parks owed Brown for narcotics that Brown had furnished him for resale, he sought to avoid Brown. However, on October 4, 1968, Parks was decoyed to a vacant house where Brown and his confederates confronted him and Brown shot and killed Parks in cold blood. The killing was unsolved for some time, but the facts eventually became known and a magistrate issued a first degree murder warrant for Brown's arrest on March 17, 1969.

On March 25, 1969, Brown was in the apartment of one Nadine Frazier when three policemen attempted to arrest him on the murder warrant. They knocked on the door and announced their purpose, but Nadine Frazier delayed opening the door. When the police entered, Brown fled out a window with one of the policemen in pursuit. Shortly thereafter Brown was captured and arrested on the murder warrant.

The two policemen who remained in the Frazier apartment observed some narcotics paraphernalia on the table and discovered two tinfoil packets in a stocking wrapped around Miss Frazier's waist. One packet contained heroin, the other cocaine. These narcotics had street value of $10,200. Other narcotics seized in the apartment brought the total street value to $14,380. Miss Frazier stated that Brown and one Westbrook brought the narcotics to her apartment and that Brown habitually brought narcotics there.

The original murder indictment was superseded on September 9, 1969, by an indictment charging Brown and two others with first degree murder in the killing of Parks. The indictment also charged Brown with carrying a dangerous weapon. These counts are hereafter referred to as the Murder Indictment.

On September 22, 1969, Brown was also indicted, along with two co-defendants, on four counts charging two narcotics offenses (26 U.S.C. §§ 7237(b), 4705(a), 21 U.S.C. § 174), carrying a dangerous weapon (D.C.Code § 22–3204), and possession of a prohibited weapon (D.C.Code § 22–3214). This indictment is hereafter referred to as Narcotics I. This is the indictment that the initial opinion completely overlooks.

2. Some of the facts stated herein come from the murder trial, United States v. Brown, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973), of which judicial notice is taken. The record in that case also indicates prior convictions for Brown as follows:

INFORMATION OF PRIOR CONVICTIONS

Comes now the United States Attorney for the District of Columbia and informs the Court that the defendant, Roland W. Brown has two prior felony convictions:

1. On December 2, 1960, he was convicted in this Court in Criminal Case No. 65–60 of selling narcotics not in the original stamped package in violation of 26 U.S.C. 4704(a), selling narcotics not pursuant to a written order form in violation of 26 U.S.C. 4705(a), and of facilitating the concealment of illegally imported narcotics in violation of 21 U.S.C. § 174.

2. On August 18, 1961, he was convicted in this Court in Criminal Case No. 1103–60 of narcotics conspiracy in violation of 18 U.S.C. § 371.

The concurring opinion points out that my Statement relies on "the record" in support of "any number of points not made in the Government's brief" (concurring opinion, n. 5). I submit it is proper and desirable to rely on "the record" when the initial and concurring opinions go outside the records and the briefs.

On September 29, 1969, another indictment charging various additional narcotics offenses was returned against Brown and eight other defendants. That indictment was superseded on February 6, 1970, by an indictment charging Brown and seven co-defendants with conspiracy to sell narcotic drugs and other related narcotics offenses.[3] It included the narcotics offenses discovered when the police entered Nadine Frazier's apartment on March 25, 1969, in their attempt to arrest Brown on the murder warrant. This indictment, originally consisting of six counts, is hereafter referred to as Narcotics II, and led to the conviction which is the subject of the present appeal.

At his own request Brown was represented in all three cases, both at trial and on appeal, by an appointed attorney named Walter Choroszej, and all cases were assigned to the same trial judge. When one considers the magnitude of these simultaneously pending offenses, one murder indictment, and two major narcotics offenses, it is apparent that Brown's counsel had his hands full. To date, these three cases, and the indictments they superseded, account for more than 30 solid pages of docket entries in the District Court.

The initial opinion by the court reviews *some* of the facts related to the trial and disposition of these cases to date, but it completely overlooks everything connected with the handling and disposition of the indictment in Narcotics I. The Government and the parties were involved in the pendency of three separate major indictments, not just two. The complete failure of the initial opinion to discover and give consideration to the substantial demands that Narcotics I made upon the court, the Government and defense counsel, is an error that alone is sufficient to set aside the court's initial opinion. The reply of footnote 16 of the initial opinion to this criticism is that it "fails to indicate anything of significance to the issue of a speedy trial in

this case." This is demonstrative of the obtuse approach taken by the initial opinion to the time demands that present-day due process decisions by this court have placed upon trial courts in this jurisdiction in the trial of criminal cases. The failure of the initial opinion to discover the pendency of this third narcotics indictment indicates either a negligent failure to review the available record or a complete insensitivity to the fact that three separate major criminal indictments cannot be properly processed *simultaneously* through the trial courts in the same time as two. The application by the initial opinion of a two-case time frame, when three cases with all their attendant motions and appeals were simultaneously pending, obviously applies a false and improper standard as a basis for reversing the conviction. The foregoing conclusory observations would appear to be self-evident from the earlier factual recitation and are merely set forth in answer to the allegation that such facts are not significant on the speedy trial issue. They are certainly significant to the analysis of the speedy trial issue by the initial opinion. Nothing more than the failure to consider the time demands of Narcotics I should be necessary to grant rehearing *en banc*. However, there are many additional reasons for doing so.

## II. *The So-called "Open Period" of Seven Months*

The initial opinion recited the progress only of the murder charge and Narcotics II, from the date of the offense to the present time. It comments on *some* of the necessary proceedings that are recorded in the docket entries and on some of the time factors that are involved. It then concludes that appellant's conviction on Narcotics II (this case) must be reversed and the indictment dismissed because appellant was not brought to trial during the "open period of seven months" (Initial Opinion, p. 1109) beginning on October 12, 1972, and running through to May 23, 1973. (I later show

---

**3.** 26 U.S.C. §§ 4704(a), 4705(a), 7237(b); 21 U.S.C. § 174.

that this "open" period was actually only six months long.) In mislabelling this the "open" period the initial opinion assumes a fact vital to its decision. This is the critical period since the opinion pointed to no other specific period of allegedly unnecessary delay. Footnote 16 attempts to deny this analysis of the initial opinion, but in doing so it furnishes *additional proof* that the seven-(six-) months was the "all-in-all basis for the decision that a speedy trial had been denied." That is, if we assume it is improper to reverse a criminal conviction an appeal on illusory, illogical and gossamer grounds.

To illustrate, footnote 16 seeks to answer the attack by this Statement on the seven- (six-) month period cited by the initial opinion by stating that such period "is by no means the only reason for our *concern*." (Emphasis added.) This is the *something else* the initial opinion relies upon—other than the seven- (six-) month period. It thus relies upon its generalized, unspecified *concern* to support a reversal of a criminal conviction. It is submitted that mere "concern" is insufficient grounds for reversal according to all prior appellate law in the federal courts. But more is asserted, equally unsound, *i. e.*, "previous significant delays *but for which* the apparently open period '*would have been* substantially enlarged.'" (Emphasis added.) To restate this ground asserted by the initial opinion: it contends the seven- (six-) month period *would have been* greater if "previous significant delays" (which could not be criticized and were not *delays* at all but merely constituted the ordinary time to process necessary proceedings) had not occurred. In plain English, what the initial opinion then does is reverse a criminal conviction for denial of a speedy trial not on the actual delay the court finds a basis to criticize, but for delay that "would have been substantially enlarged" if the court had not been dutifully attending to other court matters related to the individual. If such speculative and illogical grounds constitute a legal basis for reversing a crimi-

nal conviction, the logic completely escapes me. The ground asserted amounts to nothing more than pure speculation. It is thus the ruling with respect to this seven-month period, which the court in effect states controls its disposition of this case, that must be examined to see if the Government was delinquent in not bringing Brown to trial *earlier in this period*.

The chronology of events during the October 12, 1972–March 23, 1973, period is as follows:

Oct. 12, 1972  En banc request denied by the U.S. Court of Appeals on its reversal on interlocutory appeal of the suppression order in the Narcotics II case. 151 U.S.App.D.C. 365, 467 F.2d 419 (1972).

Oct. 31, 1972  Brown's counsel moved to dismiss Narcotics II for denial of speedy trial. See also, *infra*, comments re items Feb. ?, 1973, Mar. 29, 1973, and Tr. May 9, 1973.

Nov. 9, 1972  Mandate issued by the Court of Appeals in Narcotics II reversing trial court's suppression order.

Nov. 22, 1972  Record in Narcotics II returned on Nov. 21, 1972, to District Court from the U.S. Court of Appeals.

Jan. 22, 1973  Calendar call in Narcotics II. Trial of Narcotics II set for March 28, 1973. Co-defendant Westbrook changed plea in Narcotics II to guilty on count 6 (possession of narcotics).

Feb. 6, 1973  Brown's counsel and Government stipulated to exhibits as supplemental record on appeal of murder conviction pending in the U.S. Court of Appeals.

Feb. 8, 1973  Supplemental record in appeal of murder case delivered to the U.S. Court of Appeals.

Feb. 16, 1973  *Government motion* to dismiss indictment in Narcotics I granted.

Feb. 22, 1973  Murder case argued in the U.S. Court of Appeals.

Feb. 27, 1973 Brown's counsel (Choroszej) served *motions in Narcotics II to suppress evidence* and to reconsider decision not to dismiss indictment for lack of speedy trial.

Feb. ?, 1973 Defendant Brown filed a *pro se* motion in Narcotics II *to suppress evidence* contending the seizure of evidence was the result of an illegal search because the officer who chased him out of the room and then returned to the room where another officer had remained in the interim was making an impermissible second intrusion. Some delay was caused because the motion was never properly filed in Clerk's office (Tr. May 9, 1973, p. 1).

Mar. 28, 1973 Trial continued to May 23, 1973. (See entry of May 9, 1973).

Mar. 29, 1973 *Pro se* motion, signed Mar. 28, 1973, filed in murder case (1) to suppress illegally seized evidence, (2) challenging jury selection system, (3) for leave to be heard *pro se* in Rule 41 petition and (4) for discovery of evidence. Some delay was caused because the motion was never properly filed in Clerk's office (Tr. May 9, 1973, p. 1).

May 9, 1973 *Court hearing* on February motions by defendant and his counsel in Narcotics II: (1) to suppress evidence, and (2) to dismiss indictment for lack of speedy trial. Motions denied. "Trial remains set 5–23–73 . . .."

May 23, 1973 Narcotics II case tried only on possession charges. Conspiracy charges dismissed.

May 24, 1973 Defendant convicted in Narcotics II on counts charging three narcotics offenses.

July 6, 1973 Sentences on counts 1 and 3 of 2 to 10 years and on count 2 of 10 years. Said sentences to run concurrently with sentences on each count and concurrently with sentence presently being served.

### III. The "Open Period" Examined

Consider then what delay the initial opinion finds in the critical period—October 12, 1972, to May 23, 1973. The initial opinion takes October 12, 1972, as the beginning date because it states that was the date upon which "the reversal of the suppression order became final." (Initial Opinion, p. 1108.) However, as the docket entries disclose, the mandate following the reversal of the suppression motion was not filed in the District Court until almost a month later on November 9, 1972, when the record was returned. Thus what we are actually talking about is a six-month period and not a seven-month period. What activity with respect to this case took place during this six-month period? That is the critical question, the answer to which will determine whether the initial opinion was correct in holding that there was a denial during this period of the right to a speedy trial.

After the record was returned to the District Court, it ordered a calendar call for the case which was held on January 22, 1973. This was reasonably prompt considering the need to allow sufficient time after the reversal of the suppression order for both parties to evaluate the evidence in the narcotics case, determine the potential witnesses and ascertain their availability. The court then set a trial date of March 28, 1973. *The case could not have been set for an earlier date because the murder appeal was scheduled for argument in this court on February 22, 1973, and Brown's counsel, Choroszej, could not slight his preparation for that argument.* Neither could he at the same time prepare for a complicated conspiracy trial with the same ease that an appellate court can with the stroke of a pen write "reversed" to a judgment of conviction. The initial opinion overlooks this conflict and thus wholly fails to take into consideration the delay in trying the narcotics case necessitated by counsel's duty to prepare for and argue the appeal from the murder conviction. That conviction, with its ten years to life sentence, was the main

concern of Brown and his attorney. The conflicting commitments of Brown's counsel thus required that the narcotics case be set for a reasonable date after February 22. At the January 22 calendar call, the docket entry indicated "Trial set 3–28–73." That was certainly as prompt a setting as the circumstances would permit.

Appellant's counsel in fact requested the trial court to give the appeal of the murder case priority over the trial of the Narcotics II indictment so he could concentrate on the appeal from the murder conviction. This is apparent from the uncontradicted statement of the trial judge on May 9, 1973, during the hearing on appellant's motions in Narcotics II to suppress and for dismissal on speedy trial grounds:

> THE COURT: Now, Mr. Choroszet [sic], what you fail to address yourself to in this situation is that one of the prime considerations that have been involved in this entire matter is that, *as you well know, and as you have argued in the other case, that as between the narcotics conspiracy and the murder case, that there not be such pressure put on this defendant and you as his counsel that you could not properly address yourself to the case which, as far as Mr. Brown is concerned, he had much more at stake.* And it would have been improper for this Court with those two indictments pending to force this narcotics indictment to trial until there has been a full and complete exploration of all the problems that were involved in the murder case, and there were quite a few, as the record in that case reveals, quite a few.
>
> Now, if this Court had permitted the prosecutor to double up on Mr. Brown, and you are his lawyer and throughout the case you have worked very hard in his behalf these last four or five years—if this Court had permitted the prosecutor to harass you by forcing this narcotics case to trial, I can guarantee that it wouldn't have taken the

Court of Appeals ten minutes to reverse a conviction in this case.

Tr. 19, May 9, 1973 (emphasis added). Footnote 16 of the initial opinion asserts that "there is nothing in the record respecting a request by Brown's counsel that the trial judge defer trial of this case because of counsel's responsibility to argue the appeal in the murder case." It is submitted, however, that the foregoing italicized statement by the trial judge to whom both cases were assigned, which statement the transcript indicates was *completely uncontradicted* by Brown's counsel, plainly reflects that Brown's counsel made *exactly* such request in "the murder case."

It thus appears that appellant had made a perfectly reasonable request that the trial of the narcotics indictment be held up until his counsel had finished arguing the appeal in the murder case. This court now penalizes the public because the trial court acceded to the requests of defense counsel. In other words, by complying with the defendant's request, the trial court is claimed to have committed reversible error. Certainly that has never been the law previously in this jurisdiction or in any other jurisdiction to which my attention has ever been directed.

Footnote 16 further attempts to overly minimize the load on Brown's counsel by asserting that he only had to prepare for a one-half hour argument of the murder appeal, which took place on February 22, 1973. Since he did devote the period after argument to preparation for the narcotics trial, the substance of the argument made by the footnote is that the case could have been tried while he was preparing to argue the murder appeal. This is completely insensitive to the tremendous burden placed on defense counsel and ignores the fact that the one-half hour appellate argument sought to set aside a conviction of murder involving a sentence up to life imprisonment, that counsel would also have to fully prepare for the defense of a separate major narcotics conspiracy charge and that counsel

*requested* the trial court not to "pressure" him on the narcotics case while the murder appeal was pending. Trial counsel is to be commended for taking his responsibilities so seriously. Had the trial judge forced Brown to trial on the narcotics charge under such circumstances, the panel in this case would have been the first to reverse for denial of the effective assistance of counsel. Footnote 16 also mistakenly fails to recognize that Brown's counsel was forced to prepare to defend a six count indictment. Not until just prior to the start of the trial on May 23, 1973, did the Government reduce it to three counts charging substantive offenses and dismiss both conspiracy counts. It is thus meaningless to gauge the trial preparation burden on Brown's counsel by the trial on the reduced indictment.

The initial opinion indicates it was unable to discover why the case was not tried on March 28. However, an examination of the transcript of the May 9, 1973 hearing and the District Court case file indicates that on February 27, 1973 (one month before the date set for trial), counsel for appellant moved (1) to suppress the principal evidence in the case, and (2) for reconsideration of the denial of his motion to dismiss the indictment for lack of speedy trial. While these motions were served on the Government, they "were never properly filed in the clerk's office" until May 9, 1973 (Tr. 2, May 9, 1973). At about this time appellant had also personally filed a *pro se* motion seeking to suppress the principal evidence (Tr. 3, May 9, 1973) which in some respects was repetitious of the motion his counsel had filed (*id.* 24–26).

With respect to these motions, it is obvious that their presentation one month before trial was set might cause some continuance of the trial date, as the Government certainly needed some time to prepare for argument. Whether or not that was the reason for the continuance, however, there is nothing in the record or in the briefs to indicate that appellant ever objected to the continuance to May 23. This 55-day continuance is thus not chargeable against the Government. The motions filed by Choroszej and Brown were heard and decided on May 9, 1973. This was certainly reasonably prompt action involving no delay over normal handling. Trial of the case began two weeks later on May 23, 1973.

Thus the six-month "open period" which the initial opinion states is determinative of the speedy trial claim can be summarized as follows. After the case was returned to the District Court, in view of the fact that the argument in the appeal of the murder case was set for February 22, 1973, March 28 was as early as the case could reasonably have been set. There is no indication in this record or in the briefs that the subsequent continuance to May 23 was not compelled by motions subsequently filed by appellant and his counsel or that appellant ever objected to this short continuance. There was absolutely no delay in bringing this case to trial after the record was received from the appellate court which will justify setting aside the conviction and dismissing the indictment for lack of a speedy trial. The case was set and tried within this six-month period as expeditiously as compelling circumstances permitted. The seven months that the initial opinion found to be available to try the case vanish on examination and *no delay* at all is involved during this period except the normal time necessary to argue the pending motions and to finalize preparation of the case for trial after Brown's counsel was free of his argument in the murder case.

Later, as a second try, footnote 16 asserts the case should have been tried before February 22, 1973. Maybe it should have. The Government had sought to try Brown on Narcotics I on December 15, 1969, but Brown got out of this by his November 12, 1969 motion for commitment at St. Elizabeth's. The Government then went ahead and obtained convictions against his two co-defendants. Thus Brown could have been tried sooner on the narcotics cases had he so wished. The Government had been will-

ing to try Brown much sooner on Narcotics II, but February 22, 1973, was the day set for arguing the appeal in the murder case and, as stated elsewhere herein, Brown's counsel requested that he not be "pressured" prior to such argument. Brown and his counsel also had in mind making some additional motions which were actually filed on February 27 and March 29, 1973. So from Brown's standpoint, he was not ready for trial on Narcotics II on February 22, 1973. Thus, this belated suggestion of footnote 16 repeats the same error implicit in its more general "seven- (six-) month" suggestion by completely ignoring Brown's unreadiness for trial prior to the filing and disposition of these motions.

The initial opinion may have led itself into error in failing to note that the appeal in the murder case was set to be argued in the very middle of this period. Appellant's counsel obviously would have objected to being required to prepare and try Narcotics II at the same time he was preparing to argue the appeal of the murder conviction. If one chooses to say the Government is chargeable with the delay of the case from March 28 to May 23—55 days—during which period the court heard and disposed of the pending motions, it must be pointed out that under all decisions *such a seven- (six-) month period of time is insufficient to support a reversal of a conviction and a dismissal of the indictment*, absent vital prejudice created during this period or purposeful conduct on the part of the Government, none of which is claimed or shown here.

IV. *Appellant's Asserted Grounds for Dismissal*

An additional error in the initial opinion is its holding that the right to a speedy trial was denied even though appellant makes no claim to this court that he suffered *any* prejudice and the record before the District Court makes no showing of prejudice. *The word "preju-*

*dice" is not even mentioned in appellant's brief.* Instead, he bases his claim for dismissal of the indictment on speedy trial grounds on two contentions: (1) that it was *wrong* for the Government to appeal the suppression order, and (2) that it was "unfair" to dismiss the indictments against some of his co-defendants for lack of a speedy trial and not also dismiss the indictment (Narcotics II) as to him. Neither of these contentions is supportable.

A. The Interlocutory Appeal

Brown complains that his right to a speedy trial was denied because the Government elected to exercise its right to take an interlocutory appeal of the suppression order. He lays that appeal to a wrongful desire by the Government "to present the strongest possible case before the jury" (Appellant's brief, p. 19) and points out that *some* "narcotics obtained in New Jersey were available as evidence." He would thus limit the Government's proof.[4] However, recognizing the heavy burden of proof that the Government bears in a criminal case, and recognizing that the double jeopardy rule gives it only one chance to prove a defendant guilty, it is not to be criticized for desiring to present all available incriminating evidence at the trial. The Government, as with any other party, is entitled to present its full case. Only in that way can the public interest be properly served. It is not required to submit to erroneous judicial rulings any more than are other parties. Furthermore, since the Government *did* succeed in securing a reversal of the suppression order, its appeal was meritorious and clearly justified.

The 14 months spent in prosecuting this meritorious appeal is not considered as "delay" for speedy trial purposes. In *United States v. Bishton*, 150 U.S.App. D.C. 51, 54, 463 F.2d 887, 890 (1972), a unanimous panel of this court, citing section 2.3 of the Minimum Standards of

---

4. This is equivalent to admitting he was guilty even without the evidence of the narcotics seized in the apartment. We are thus not faced with any question as to the sufficiency of the evidence.

the American Bar Association, stated that "the time spent on appeals is not generally included for purposes of calculating the period of delay in prosecution . . . [except where] the Government's action . . . indicates bad faith, neglect, or a purpose to secure delay itself or some other procedural advantage . . . ." Although the Government lost its appeal in that case, we did not charge the eight-month delay against it. Here the Government prevailed on its appeal and there is no claim that the appeal was "arbitrary, negligent or purposely oppressive." Thus, there is even less reason for charging the Government with the delay in the instant case.

### B. The Unfairness Issue

Appellant's second point is that "It seems *unfair* that [he] was denied his right to a speedy trial when the same right was granted to his co-defendants." There is nothing unfair in the different disposition of these two different factual situations. The co-defendants whose indictments were dismissed on speedy trial grounds were not charged with the other offenses with which Brown was charged and which were holding up the trial of Brown and his co-defendants on the narcotics charges. Their counsel were not tied up trying other cases for them and never asked to let the narcotics trial abide some other pending case. Hence Brown's co-defendants in Narcotics II were in no way responsible for the delays which were caused by the proceedings involving Brown's murder indictment and the Narcotics I indictment. Under such circumstances it was proper to deny Brown's motion and to grant some of the motions of other defendants who had not contributed to the delay.

### V. *The Search for Prejudice*

Faced with this complete absence of any claim or showing of prejudice by the appellant in his brief and argument, the initial opinion seizes the initiative and attempts to find prejudice where none has been claimed and where the trial court found none. To accomplish this the opinion takes several tacks.

### A. Stretching the Pretrial Period.

First, the initial opinion attempts to produce the appearance of prejudice by stretching the period during which it claims Brown was suffering from not being tried. To do this it begins with the date Brown was arrested on the *murder* charge, March 25, 1969, not the date he was first charged with the Narcotics II defense, September 22, 1969, or the date the instant indictment was returned, February 6, 1970. Using the March 25, 1969 date stretches the period complained of by six months, a wholly impermissible tactic—illogical, contrary to law and unreasonable. During this six-month period, Brown could *not* have been tried on the Narcotics II indictment even if both he and the Government had wanted to do so, because no charge had been filed. A person certainly cannot be tried before he is charged. But the initial opinion holds the Government responsible for the time *not* spent in so doing.

The initial opinion states:

In computing the time lag *before trial* we think the starting point [for the *narcotics* case] is the date of the arrest on the warrant charging *murder*, March 25, 1969, for it was in attempting to execute that warrant that the principal basis for indictment on the present charges was laid. (Initial Opinion, p. 1107, emphasis added.)

This is certainly not legal logic. The opinion thus holds that the period within which to compute one's right to a speedy trial commences when the Government begins its investigation of the case. This is grossly erroneous and unsupported by any law. The Constitution states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy trial . . . ." Art. VI. This language definitely ties the right to a speedy trial to the existence of (1) a criminal prosecution, and (2) a definite person being "accused." Until there is a prosecution and until some person is "accused" in a

"criminal prosecution," the Sixth Amendment does not apply. In this instance, there was neither a "criminal prosecution" nor an "accused" until Brown was indicted in Narcotics II. Obtaining initial evidence as to one's possible involvement in a crime, and later considering the possibility of indicting him, does not make that individual an accused or formalize the investigative activities into a criminal prosecution. It is only when a complaint charging a crime or an information is filed, or when an indictment is returned, that the right to a speedy trial begins under the Sixth Amendment. To compute Sixth Amendment "delay" prior to the charge is erroneous.

On this point the provisions of the recently enacted Speedy Trial Act of 1974, Pub.L. 93–619, Jan. 3, 1975 (88 Stat. 2076) should be noted. By making certain provisions for carrying out the constitutional right to a speedy trial (see 18 U.S.C. § 3161 et seq.), this statute necessarily interprets that provision of the Constitution. It defines the type of person entitled to the benefits of the Act as "A defendant charged with an offense." 18 U.S.C. § 3161(a). This is completely consistent with the Sixth Amendment and obviously forecloses applying the statute, as the opinion would do, to periods prior to the time Brown became "a defendant" or was "charged with an offense."

It is a bit hard to accept this six-month period when the narcotics charge was not pending, and when Brown was never incarcerated on the narcotics charge (see section B, infra), as part of some "delay" period and to accept the contention that the Government must explain why it did not try Brown on a non-pending charge. For the initial opinion to start its computation of time at Brown's arrest on March 25, 1969, under such circumstances is absurd.

B. The treatment in the Initial Opinion of the refusal of the Government to arrest or incarcerate Brown in connection with the narcotics case prior to trial.

In trying to build up its claim of prejudice, the initial opinion glosses over the fact that Brown was never arrested or incarcerated on the narcotics charges— either in Narcotics I or Narcotics II— prior to the trial of the narcotics offenses. For example, it states: "The trial of appellant on this [narcotics] indictment was not held until May 1973, more than four years after the arrest" and "Appellant was not indicted on the narcotics charge until September 29, 1969, while in custody following arrest" (Initial Opinion, p. 1107, emphasis added). These imprecise statements, in failing to note that "the arrest" was not on the narcotics offense but was only on the murder charge until December 14, 1971, and thereafter was on the murder conviction, convey to all except a suspicious reader the impression that during this entire time Brown languished in jail awaiting trial in Narcotics II. In fact, he was never jailed for as much as a moment on the narcotics charges before his conviction on those charges. If appellant had been arrested only on the narcotics offenses, he presumably would have been released on bail like the other defendants, but he was never required to post bail on those charges.

The initial opinion at page 1112 also states:

> Though we cannot measure in an accurate manner the degree of personal prejudice to appellant, we cannot ignore it; and it was aggravated by appellant's incarceration, though that was due to the murder case as well. (Emphasis added.)

The italicized words are intended to convey the impression that appellant was incarcerated on the Narcotics II charge "as well" as the murder conviction. This is incorrect. As is stated above, appellant was never incarcerated on the Narcotics II offense at any time prior to trial. All statements and implications in the opinion to the contrary are pure misstatements of fact.

C. The alleged unavailability of certain witnesses.

Even though no actual prejudice was claimed by appellant on this appeal and any such claim was thereby waived, the initial opinion seeks to buttress its theory of the case by claiming that at trial:

[Appellant's counsel] named two witnesses who had once been but now were no longer available to testify, a man nicknamed "Little George" who had since died, and Nadine Frazier, the woman whose apartment was searched on the date of appellant's arrest in March, 1969. (Initial Opinion, p. 1109)

To be accurate, appellant's counsel at trial also mentioned a third person, Westbrook (Tr. 22, May 9, 1973). Why the initial opinion does not refer to him is not known. The concurring opinion also mentions these "witnesses." However, the mere oral mention of the names of persons who are claimed to be potential witnesses falls far short of a demonstration of prejudice by an impaired defense, especially when these claims were never raised on appeal. Since both the initial and concurring opinions now attempt to resuscitate them, let us examine the record for any indication of prejudice.

Nadine Frazier was clearly *available* as a witness because she *actually testified* for the Government in the case. Thus the opinions are completely incorrect in this claim. Westbrook was likewise *available* at all times since he was a prisoner at the Atlanta Penitentiary and could have easily been produced.[5] Moreover, *appellant never called either of these available witnesses.* Thus the statement at the argument on the speedy trial motion with respect to these "witnesses" was incorrect in two particulars, i. e., both witnesses were available and at least one witness (Frazier) did not support his position. Westbrook would probably not have assisted appellant's case either as he had entered a guilty

plea to a portion of the same offenses prior to appellant's trial.

As for "Little George," appellant never made any proffer of the testimony he would have given if he were available to testify, and the trial judge recognized the speciousness of Brown's claim that "Little George" might be a helpful witness. Because he was familiar with the testimony "Little George" had given in other cases, the judge said, "You wouldn't have him here anyhow" (Tr. 22, May 9, 1973). Counsel never denied this. Thus the unavailability of "Little George" in no way prejudiced appellant's defense.

These claims of missing witnesses are insufficient grounds upon which to conclude or presume that appellant was prejudiced by the passage of time before his case was tried. All this may explain why appellant's counsel on this appeal, while asserting a *pro forma* denial of speedy trial, actually dropped all claims of prejudice related to these three witnesses and *never* claimed any prejudice to his client as a result of any delay in the trial. Even if some prejudice could be demonstrated, questions which only lurk in a record and which are not raised, briefed or argued should not be reached on appeal. *El Paso v. Simmons,* 379 U.S. 497, 502, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *McNeal v. Culver,* 365 U.S. 109, 117, 81 S.Ct. 413, 5 L.Ed.2d 445 (1961). The effort of the opinions to find prejudice where none is claimed should be rejected completely.

D. Extending the speedy trial period beyond the date of the actual trial.

Having first attempted to increase the period of time the Government must account for on the speedy trial claim to include the investigation period *before* the offense was ever charged, the opinion also improperly seeks to extend such period to include time *after* the date the

5. Westbrook was arrested on June 15, 1972, in the Northern District of Georgia (Atlanta) on a bench warrant for failure to appear and was released on bond on June 21, 1972. He was a co-defendant in Narcotics II.

case was tried. This approach is beyond belief, but that is the effect of the reference in the initial opinion to the portion of time the appeal in the murder case was pending *after* the trial in the instant case (Initial Opinion, p. 1108). In other words, the opinion, by its adverse comment, suggests the Government might be held responsible when a speedy trial claim is made with respect to Case A, not only for the time *before* the trial of Case A, but also for the time *another* case (Case B) was pending after the trial of Case A. Such time factors are completely irrelevant to any speedy trial issue in Case A (this case), and this demonstrates the difficulty the initial opinion encounters in its attempts to locate some prejudice. Footnote 16 denied that the *specific references* cited above entered into the "time calculations in the court's disposition of the speedy trial issue." What then were such adverse comments doing in the initial opinion? The sole function they serve is to inject what footnote 16 now admits is *irrelevant prejudice*. That is objectionable at trial and even more objectionable in an appellate opinion.

E. The American Bar Association Standards.

The American Bar Association Standards on Speedy Trial § 2.3 (1968) provide:

> The following periods should be excluded in computing the time for trial:
>
> (a) The period of delay resulting from other proceedings concerning the defendant, including but not limited to an examination and hearing on competency and the period during which he is incompetent to stand trial, hearings on pretrial motions, interlocutory appeals, and trial of other charges.

This is a reasonable rule. Applying it here, the periods of delay resulting from (1) "other proceedings" (the murder case, Narcotics I), (2) "hearings on pretrial motions" (motions to suppress and to dismiss for lack of speedy trial filed on February 27, 1973, and heard on May 9, 1973), and (3) the "interlocutory appeal"

of the motion to suppress, would be "excluded in computing the time for trial."

VI. *Time Chargeable to the Defendant*

The initial opinion states it has difficulty in finding that any significant part of the lapse of time between arrest (or indictment) and trial can be charged to appellant. However, the record indicates that very substantial portions of this delay can be ascribed to him. There is no question that the Government acted very speedily in bringing him to trial on the murder charge. He was indicted in that case on September 9, 1969, and was found guilty on October 24, 1969. *At that point Brown started to delay matters in an effort to avoid the results of the jury verdict.* As pointed out above, he was successful in avoiding a speedy trial on Narcotics I by his unsupported claim of insanity.

A. The motion to determine Brown's competency.

On November 12, 1969, Brown made an oral motion for commitment to St. Elizabeth's Hospital for a mental examination. The order directing this examination and report was signed on November 14, 1969. This examination necessarily involved a considerable period of observation. Brown's co-defendants on Narcotics I went to trial on December 15, 1969, and were convicted on December 23, 1969, and Narcotics II (this case) was called for trial on February 3, 1970. At that time it was continued because of the pendency of Brown's competency hearing. On April 30, 1970, the hearing on the report of St. Elizabeth's was called and was continued until May 25, 1970, when the competency hearing was held. At the conclusion of this hearing, the court found Brown to be competent but ordered a bifurcated trial on the issue of insanity. At the same time, on the Government's motion, the court ordered that this bifurcated trial on competency with respect to the murder charge was to be consolidated with the issue of competency in Narcotics II.

Brown entered no objection, and on September 14, 1971, the jury trial to determine his competency with respect to both the murder and the narcotics charges commenced. Thus the trial of Narcotics II in effect first began on this date in 1971, not May 23, 1973, as the initial and concurring opinions state. On September 22, 1971, the jury found that Brown was criminally responsible on count 1 (second degree murder) and count 2 (carrying a dangerous weapon). This verdict was also determinative of competency with respect to the narcotics offenses because that was the effect of the court's order, and the determination of sanity resulted in that issue *not* being raised further in this case.

Thus the entire period from November 12, 1969, when appellant first made his motion for a competency hearing, until September 22, 1971, when the jury found that he was competent, is fairly chargeable to the appellant. This is a period of one year, ten months and ten days.

### B. The interlocutory appeal.

Appellant also caused the delay resulting from his motion to suppress the narcotics evidence in Narcotics II and its subsequent appeal. The docket entries reflect that the hearing on a motion to suppress certain New Jersey evidence began on June 16, 1970. (This motion was ultimately denied and so is unimportant to our consideration.) On June 17, 1970, the court also first heard argument on a motion to suppress certain evidence seized in the District of Columbia. The court took the matter under advisement on June 19, 1970, and thereafter briefs were filed by a number of the defendants. Apparently Brown was relying on the activity of the other defendants. The matter was further argued on March 25, 1971, and Brown's co-defendant Westbrook filed his last brief on March 30, 1971. On April 12, 1971, the motion to suppress was granted orally as to Brown. The written order is dated May 12, 1971. On June 11, 1971, the Government, as it had a right to do, appealed to the U.S. Court of Appeals, which on September 13, 1972, reversed

the suppression order. *United States v. Brown,* 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). This motion and its ultimate disposition thus took from May 12, 1971, to September 13, 1972, a period of seventeen months. The docket entries indicate that of this period, the Government is chargeable with the three months and 13 days during which it prepared the record and filed its brief. Six months and 16 days were chargeable to Brown for filing his brief and a motion for *en banc* reconsideration. Four months and 19 days elapsed from the filing of briefs on appeal until oral argument, and three months and 17 days later the opinion issued. No unreasonable delay occurred here except in the four months and 19 days it took to file Brown's brief.

Since it was Brown's motions that caused these delays, the Government certainly is not chargeable. Brown tried to suppress evidence that should not have been suppressed, and he claimed an insanity defense that was not supportable. The Government is in no way responsible for the length of time it took the courts to hear Brown out and deny his motions. If these motions had not been made, the case certainly "would have been" tried sooner, but it was Brown who took the acts that prevented an earlier trial. All the Government was doing was affording Brown his due process rights and protecting the public interest in seeing that the case was properly tried according to the facts and the law.

### C. Appellant's delay in filing briefs.

Brown appealed the murder conviction on December 15, 1971. On January 19, 1972, 19 volumes of transcript (over 2100 pages) were filed in the U.S. Court of Appeals as the record in the case. On March 24, 1972, Choroszej was appointed as counsel on appeal and an extension was granted to file appellant's brief. Other extensions were granted to June 13 and July 13, 1972, time having expired. On August 2, 1972, *appellant's* brief was filed, *eight months and fifteen days* after the date the appeal was taken. Considering the magnitude of the

record in this case, this does not appear to have been an unreasonable period. In any event, this period is obviously chargeable to the appellant, and the Government certainly has no obligation to explain it. The Government's brief was filed on October 18, 1972, two months and sixteen days after appellant's brief was filed but certainly not an inordinate length of time considering that the case involved over 2100 pages of testimony and proceedings in open court.

### D. The delay at the request of Brown's counsel.

Finally, because appellant requested that the trial of the narcotics case be deferred until after he argued the appeal of the murder conviction (see part II, *supra*), he was responsible for the delay in the trial of Narcotics II from December 14, 1971, when sentence was imposed on the second degree murder conviction, until February 22, 1973, when he argued his appeal of the murder case in the Court of Appeals and for a reasonable period thereafter.

It is thus submitted that very substantial portions of time were chargeable to Brown.

### VII. *The Date Trial on This Indictment Began*

The opinion assumes that Brown was not brought to trial on this indictment "until May 25, 1973." This is incorrect. As noted in section VI. A., *supra,* the first phase of the case, the issue of his sanity, was tried in the consolidated competency trial which began on September 14, 1971. By granting the motion of the Government of June 3, 1970, the issue of insanity in the narcotics case, which covered the same period as the murder events, was to abide the jury verdict on insanity in the bifurcated murder trial. When the jury found Brown to be sane, that verdict controlled the narcotics case and insanity was never again raised in that case. Thus the trial of Brown on the Narcotics II indictment actually began on September 14,

1971, not May 25, 1973. The initial and concurring opinions overlooked this fact.

### VIII. *Speculative Considerations in the Opinion*

The initial opinion asserts that the so-called seven-month open period from October 1972 to May 1973 "*would have been* substantially enlarged except for the periods which elapsed *before* the motion to suppress was acted upon and finally disposed of . . .." (Initial Opinion, p. 1111, emphasis added.) In clearer words, the quoted statement argues that if the motion to suppress had been finally decided at an earlier date, there "would have been" a substantially longer period of time than seven months before Brown was brought to trial. This assumes that in such circumstances Brown would *not* have been brought to trial on Narcotics II before May 1973, but there is no basis for that assumption. If the trial and appellate courts had been able to decide the other motions sooner, Brown "might have been " brought to trial earlier and the "open period" might have been reduced. One speculation is as much warranted as the other.

There might, however, be something in what the opinion states (but it does not aid the appellant) because apparently what really held up the trial of the Narcotics II case until the end of the so-called "open period" was the request of appellant's attorney that he not be forced to trial on the narcotics case until after he had been permitted to prepare and argue the appeal on the murder conviction, which he considered to be more vital to his client. This was set in the U.S. Court of Appeals for February 22, 1973. Since this delay was caused by acceding to appellant's request, it cannot reasonably be asserted, as the opinion does, that the Government is responsible for denying him a speedy trial.[6] However, all this speculation as to what the open period "would have been" under events other than what actually transpired is beside the point. Appeals should be determined on the actual facts,

6. It must be noted that appellant makes no such claim on this appeal.

not on what any person speculates "would have been" the facts under other circumstances.

## IX. *The Relevance of* Smith v. Hooey

The concurring opinion also seeks support from *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), where a prisoner was confined on a sentence in a federal penitentiary for six years while he vainly tried to get a state to try him on a pending indictment. The Court found that in such circumstances, delay in bringing a person to trial might ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. It pointed out that he might lose his right to a partially concurrent sentence and that the duration of his imprisonment might be increased because of the pendency of another charge. The Court then noted the possibility that an outstanding untried charge can have fully as depressive an effect upon a prisoner as upon a person who is at large. What the Court was addressing itself to, however, in that case was a situation where the prisoner spent six years in confinement while *nothing* was being done about his state charge. That is a far different situation than exists in the present case. After his murder conviction, Brown was not just serving time in prison. Instead, three cases against against him, with their attendant motions and proceedings, were clogging the courts, moving forward at the trial and appellate levels. He first tried to get out of all charges on an ultimately unsuccessful insanity plea which necessarily took time. Then he appealed his murder conviction and requested that he be permitted to argue that case on appeal before he was tried on his narcotics cases. The court granted his request in that respect. In the interim his suppression motion had also been granted by the trial court and then reversed on an interlocutory appeal, consuming additional time.

This case is thus distinguishable from *Smith v. Hooey* in that here we do not have the case of an individual languishing in jail or prison while other charges against him are completely held in abeyance. None of the facts the Court relied on in *Smith v. Hooey* exists here. Appellant was faced with three major criminal offenses that *were being processed by the courts,* as the initial opinion states, in the face of "[u]navoidable difficulties [which] confronted the trial court in bringing the narcotics case [Narcotics II] to trial." (Initial Opinion, p. 1113.) However, even if *Smith v. Hooey* was relevant to this case, the factors which it relied on to find possible prejudice are not present here.

A. Loss of opportunity for concurrent sentence or increase in the length of imprisonment.

One of the possibilities of prejudice referred to in *Smith v. Hooey* is that denying a person a speedy trial might cause him to lose an opportunity to serve a partially concurrent sentence. Brown has never suffered the least in this respect. His sentence on Narcotics II was for two years to 10 years each on counts 1 and 3 and ten years on count 2, said sentences to run concurrently with each other and *concurrently* with any sentence then being served. This sentence was adjudged on July 6, 1973. At that time Brown was serving the following sentences adjudged on December 14, 1971, on the conviction in the murder case:

Second degree murder—10 years to life

Carrying a dangerous weapon—2 years to 10 years

On December 28, 1973, the Court of Appeals reversed the murder conviction and affirmed the conviction for carrying a dangerous weapon. *United States v. Brown,* 160 U.S.App.D.C. 190, 490 F.2d 758 (1973).[7] Thereafter, since Brown had been convicted and sentenced on Narcotics II, the Government permitted

7. The opinion reversing this murder conviction was based on the improper admission of state-of-mind hearsay testimony which went to the identity of the killer.

him to enter a plea of guilty to the reduced charge of manslaughter. On June 6, 1974, the court adjudged a sentence for this offense. of 2 to 10 years, to run *concurrently* with the sentence on the count charging carrying a dangerous weapon and *concurrent* with any other sentences presently being served. The court contemporaneously vacated the December 14, 1971 sentence of ten years to life on the murder conviction. Finally, on June 18, 1974, the court further amended its sentences in both the murder (manslaughter) and Narcotics II cases as follows:

ORDERED that the Judgment and Commitment and Order of Commitment in the above entitled cases of July 6, 1973 and June 6, 1974, respectively, be and the same are hereby amended by adding the following.

It is further ordered that the Defendant receive credit on both sentences for time served from March 25, 1969.

March 25, 1969, was the date Brown was first arrested on the murder charge.

The court's order of June 18, 1974, thus gave Brown more credit than he was entitled to on the instant offenses,[8] and all sentences were adjudged to be served concurrently from the earliest possible date that applied to any of the offenses. Appellant will therefore never be required to serve one day's imprisonment by virtue of having lost any opportunity to have any sentence run concurrently with another sentence, and no sentence imposed on him was lengthened because of any delay in any trial. It is thus groundless for the opinion to speculate about the possibility of losing concurrent time or of having his sentence increased when neither possibility eventuated.

B. "Personal prejudice" from public accusation of criminal conduct.

The concurring opinion purports to find some "personal prejudice" in the al-

leged suffering and mental anguish that Brown underwent from the "anxiety and concern accompanying [the] public accusation" in the Narcotics II indictment. (Concurring Opinion, p. 1117.) However, there is no showing of this "prejudice" in the record or any claim of it by appellant on this appeal. I submit this is because it was nonexistent. The personal prejudice is purely the invention of the court's opinion, unsupported by anything except its powers, if any, to indulge in presumptions. In finding prejudicial "anxiety" under such circumstances, the omniscience of this court is truly amazing. The insight thus claimed—the ability merely to look at the cold printed record of this case, which contained *not a single word of testimony from Brown himself or from any other source as to his "anxiety,"* and see within Brown's mental processes the chimerical state of "anxiety"—is really remarkable.

I would not presume, in the absence of a claim on appeal, that Brown was suffering sufficient anxiety and concern over the "delay" in finally disposing of the Narcotics II charges to justify setting aside the conviction, particularly when he was largely responsible for that delay. After all, as early as October 24, 1969, a jury had found Brown guilty of a cold-blooded murder in the second degree and of carrying a dangerous weapon. Faced with the sentences imposed for these offenses on December 14, 1971, including the ten years *to life sentence* on the murder charge, and considering the practical inability of the court to give any sentence exceeding life imprisonment, Brown need not have been unduly worried about being sentenced to any additional period of imprisonment. Brown had also been previously convicted of narcotics offenses in 1960 and 1961, so such accusations were not exactly new to him. With such a person, such a record for cold-blooded murder and heinous narcotics offenses, and such a sentence, in my view it unduly stretches

---

8. Since he was never arrested on the narcotics offense, he was not entitled to credit against his narcotics sentence for any time that preceded the date of sentencing.

judicial power to presume any prejudice, especially *where none is claimed.*

## X. *Balancing the Various Interests*

*Barker v. Wingo, supra,* set forth various factors which should be balanced in determining whether an accused has been denied his right to a speedy trial. As any analysis of my Statement makes clear, my balancing takes into consideration a number of factors that the initial opinion overlooked. Hence, I come to a different result. I view the various factors as follows:

(1) Length of delay:

The opinion finds only seven months of unexcused delay. It is submitted that when factors which the opinion has overlooked are considered, there was no unexcused delay whatsoever in this so-called seven-month "open period."

(2) Reason for delay:

If "delay" refers to unexcusable delay, it is submitted that there is no such delay. If it refers to the mere running of time from the filing of the charge to final trial, then the court's initial opinion asserts the reason is "operation of the system," Initial Opinion, p. 1109, and "unavoidable difficulties," *Id.,* p. 1113.

(3) Assertion of right:

Several motions were made, but appellant's attorney also made a contradictory request to continue the Narcotics II case until after argument of the appeal in the murder case and he refused an offer by the Government to try the case with the murder case. Also, when the case was called for trial on February 3, 1970, it was delayed because of *appellant's* claim of insanity and his pending examination at St. Elizabeths.

(4) Prejudice to appellant:

None is claimed on appeal. Before the trial court, Brown made an unsupported assertion that delay had denied him three material witnesses, but this claim was dropped on appeal. Two of the named witnesses were available but were not called, so the claim was specious to that extent. As to the third witness, there was no proffer to support a claim that his testimony would aid Brown. See discussion, section V. C. *supra.* There was no showing that Brown was in any way deprived of his ability to defend against the charge.

Finally, *Smith v. Hooey, supra,* established certain standards for weighing prejudice to an accused. Taking these up *seriatim,* I view them as follows:

(1) Prevent undue and oppressive incarceration prior to trial.

Brown was never incarcerated on the narcotics charge prior to trial.

(2) Minimize anxiety and concern accompanying public accusation.

Brown's concern over his *public accusation* of these offenses was certainly minimal, if not wholly non-existent, in view of his being imprisoned on the murder charge and his history of two prior narcotics convictions. There also was no claim or showing of any anxiety or concern. Brown's imprisonment cannot be claimed to aggravate his anxiety and concern over the Narcotics II charges since he was never arrested or imprisoned on the narcotics charges prior to his trial on those charges. He would have been incarcerated exactly as he was even though the narcotics charges had never been brought.[9]

---

**9.** The concurring opinion finds appellant to have a "general anxiety . . . from having an undisposed indictment . . . pending" and indicates my Statement discounts this because it considered "appellant was a fairly hardened criminal." Concurring Opinion, p. 1117. His record proves he is a fairly hardened criminal. It was my opinion that re-

versed his murder conviction for the improper admission of state-of-mind testimony. United States v. Brown, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973). Every line of that very extensive trial record which I read in that case, and of which this court can take judicial notice, proves the cold-blooded murder that Brown perpetrated there. The record here also re-

(3) Limit the possibility that delay will impair ability to defend himself.

No claim was made on appeal, nor any supportable claim advanced before the trial court, that Brown's ability to defend himself was in any way impaired.

Upon the above analysis of the facts and the applicable law, it is my conclusion that Brown was in no way prejudiced. His difficulty arose from the fact that he committed so many offenses in conjunction with so many other individuals and raised so many defenses that they could not all be tried at once consistent with the requirements of due process and the right of an accused to adequate assistance of counsel. The only period of time the initial opinion found to be "inexcusable delay" was the seven- (really six-) month period from October 1972 to May 1973. When one considers that Brown's counsel requested this delay (or most of it) so he could concentrate on preparation for the argument of the murder appeal, set for the middle of this so-called "open period," it becomes clear that even this "delay" was excusable. Brown could have been tried at the beginning of this period had he been willing. In any event, a six-month delay does not ordinarily constitute denial of a speedy trial.

## XI. *The Concurring Opinion*

As stated above, the concurring opinion was issued long after the circulation of practically all of the foregoing Statement. It is obvious that the concurring opinion finds the basis of the initial opinion to be insufficient and attempts to

shore it up, but in making such attempt, in my view it has the following defects in addition to those previously referred to:

(a) The concurring opinion complains of a two year and five month delay. However, nine months and eleven days of this period ran from June 19, 1970, when the court took the matter under advisement, until March 30, 1971, when appellant's last brief was filed. The Government is not responsible for this. When on April 12, 1971, the trial court granted appellant's motion, the Government took an interlocutory appeal and the remainder of the period was consumed by the parties in preparing the appeal, submitting briefs, setting the argument and awaiting the decision of the Court of Appeals that reversed the decision of the trial court. *The Government prevailed on its appeal,* and no person has pointed to any unreasonable delay in the appeal except possibly as to Brown himself (see p. 1131, *supra* ). Thus, there is no delay in this period that is chargeable to the Government. If the normal processing of an appeal can be called delay, it was the appellant's improper motion, reversed on appeal, that caused it. In any event, *United States v. Bishton, supra,* holds that time on appeal is excludable in calculating delay.

(b) The concurring opinion states it is relying on *United States v. Perry,* 353 F.Supp. 1235 (D.D.C.1973) "affirmed by order of this court entered on December 12, 1973." (concurring opinion, p. 1115) and states "[in] *Perry* . . . we found excessive a similar delay of only a little more than two years." (concurring

flects additional convictions of two major narcotics offenses going back to 1960. *See* note 2, *supra.* These all prove that Brown has not changed his ways. In the murder trial there was evidence that Brown was a distributor of narcotics through pushers. Thus, this record proves that his character as a "fairly hardened criminal" is not open to question. If he is not a "fairly hardened criminal," then there are none in existence. I would look at the "anxiety" the concurring opinion finds in Brown in a different light from that of a casual first offender charged with a minor offense. It is only common sense to recognize that a fairly

hardened criminal (already under a sentence of up to life imprisonment murder) should not be presumed to suffer the same "anxiety" because of a pending narcotics indictment as persons with less or no criminal record. Certainly the loose, ethereal finding of "anxiety" should not be manufactured out of thin air under such circumstances, as the concurring opinion does in this case, without such claim being made in the record or briefs and without any such finding by the trial court. The finding of "anxiety" under such circumstances is a pure unfounded assumption unsupported by the record.

opinion, p. 1115, emphasis added). But Rule 8(b) of this court provides that "unpublished orders . . . are not to be cited in briefs or memoranda . . . as precedents." Neither then are they precedents in opinions. This is just one indication which illustrates how far the two opinions feel they need to reach out to attempt to support their position. In any event, *Perry* is inapplicable because there the trial court found that the defendant was prejudiced whereas here the trial court did not find any prejudice.

(c) The concurring opinion argues at length in an effort to avoid the fact that the trial of this case actually began on September 14, 1971, when the trial court began the bifurcated trial on the insanity issue. It is true that the court only submitted the issue of sanity with respect to the murder and firearms charges, but the court had found that the insanity issue in this case was *identical* to the insanity issue in the murder and firearms case.[10] Thus, in accordance with the court's order consolidating the competency phases of the two trials, the finding of sanity there controlled that issue in this case. This is clear because following the jury's determination *insanity was not raised as a defense in this case*. Under such circumstances, it is specious to say that the issue of insanity in this case was not determined by the trial which began on September 14, 1971. That is thus the date when the trial of

the issues in this case began. (See also p. 1132, *supra.*)

(d) It is submitted that the concurring opinion's weak discussion of the alleged impairment of appellant's defense proves there was no actual impairment (concurring opinion pp. 1117–1118). This point is discussed at page 1129, *supra.* "Little George" (Stewart) had died, but we know he would *not* have been helpful because he testified at the murder trial where *Brown's narcotics activity was the motive for the murder.* "Little George" was only an alibi witness. If he had been able to dispel the narcotics activity accusation, he would have done so at the murder trial. That he did not, supports the trial court's conclusion that Brown would not have called him in this narcotics case.

The concurring opinion then shows its greatest weakness by going outside the record and relying on a name (Moore), never called in the murder trial and never suggested to the trial court in this case. Then, with absolutely no proffer whatsoever as to what Moore would testify to, the concurring opinion finds a "reasonable possibility" of prejudice. If such facts present a "reasonable" possibility, the dictionary definition of the word has been changed.

(e) The concurring opinion also states that appellant first moved to dismiss for

---

10. The court on June 2, 1970, granted the Government's "Motion to Consolidate Bifurcated Trials" in the "second degree murder, 1516–69 . . and the narcotics conspiracy, 195–70" (this case) in reliance on the following allegations:

2. On May 25, 1970, the Court ruled that the defendant had raised a factual issue of insanity with regard to both the murder trial, 1516–69, and the narcotic conspiracy, 195–70. The defendant then moved for a separate bifurcated trial of insanity in the narcotic conspiracy scheduled to start on June 15, 1970.

3. If the defendant is found guilty of narcotic conspiracy, the insanity determination relative to this case and to the homicide will be identical. The same doctors, the same examinations, the same lay witnesses, the same factual records, the same periods of time will be involved. No different testimony or issue can be anticipated in either bifurcated trial. No prejudice could result to the defendant, as the same Government evidence will underlie both proceedings. Consolidation of the two virtually identical proceedings will conserve a great deal of Court, hospital, private physician, lay witness, and attorney time.

For the above stated reasons, the Government urges the Court to consolidate the bifurcated insanity trials in criminal numbers 1516–69 and 195–70. Determination of the defendant's mental responsibility can be fairly made without two separate jury trials of the same issue.

Motion of June 2, 1970. The granting of the motion effectively adopted the uncontroverted facts set forth above.

denial of a speedy trial on May 18, 1971, but the docket entries indicate a similar motion was also made on February 11, 1970. The instant indictment was returned on February 6, 1970, and appellant was arraigned on February 26. The motion to dismiss for lack of a speedy trial was certainly speedy—it was filed even before arraignment. The short length of time involved between indictment and the motion makes it apparent that the motion at that time was frivolous.

(f) The concurring opinion and the initial opinion are also completely at variance with the standards of the Speedy Trial Act of 1974 (88 Stat. 2076). Some provisions of this statute do not become effective until certain periods after July 1, 1975, but the Act was passed on January 3, 1975, and those provisions which represent congressional determinations as to the periods of time that should be *excluded* in computing speedy trial requirements are not covered by any provision delaying their effectiveness. As to delay, the Speedy Trial Act declares:

§ 3161. Time limits and exclusions.

\*　　\*　　\* .　　\*　　\*　　\*

(h) The following periods of delay shall be *excluded* . . . in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

(A) delay resulting from an examination of the defendant, and hearing on, his mental competency, or physical incapacity;

\*　　\*　　\*　　\*　　\*　　\*

(C) delay resulting from trials with respect to other charges against the defendant;

(D) delay resulting from interlocutory appeals;

(E) delay resulting from hearings on pretrial motions;

\*　　\*　　\*　　\*　　\*　　\*

(G) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement.

\*　　\*　　\*　　\*　　\*　　\*

(3)(A) Any period of delay resulting from the absence or unavailability of the defendant or an essential witness.

\*　　\*　　\*　　\*　　\*　　\*

(8)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161 (88 Stat. 2077–78) (emphasis added). It is obvious that application of these principles to this case would completely destroy the time computations demanded by the initial and concurring opinions, and there is no reason that they should not be applied here. Footnote 16 replies to this by asserting that the trial took place before the passage of the Speedy Trial Act, but the "delay" provisions of the Act represent a sound interpretation of the Constitution and should be followed for that reason. They are also representative of the principles Congress considers should be applied to cases such as we have here. Appellate courts review trial court judg-

ments in the light of the law existing at the time of the appellate decision, *Fusari v. Steinberg,* 419 U.S. 379, 387, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975); *Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 414, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972); *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); *United States v. Alabama,* 362 U.S. 602, 604, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960), and the delay provisions of the Speedy Trial Act are now in effect. The only reply the initial opinion has as to this point is to state it relies on the Constitution. In other words, it asserts that these delay provisions of the Speedy Trial Act are unconstitutional. Certainly no answer is necessary to such assertion. They are perfectly reasonable interpretations of excusable delay in court proceedings and generally follow sound law in the United States.

## XII. *Brown's Refusal of a Speedy Trial*

The initial and concurring opinions are also flawed in another respect. They rely too strongly on pure *time,* without any showing of serious prejudice. But the controlling case law tells us that time is only one factor. In *Smith v. Hooey, supra,* there had been a delay of *six years* and yet the Supreme Court did not set aside the indictment. It remanded the case to the trial court to decide the various issues. The panel here, however, exceeds its appellate powers and orders the "dismissal of the indictment" in the teeth of justice.

What is required is a "diligent, good-faith effort to bring [the defendant to trial]," *Smith v. Hooey, supra,* 393 U.S. at 383, 89 S.Ct. at 579, and that was clearly present here. Actually Brown evaded a speedy trial on Narcotics I and declined a speedy trial on Narcotics II when he was given the opportunity, im-

mediately after his indictment on the narcotics conspiracy, to have Narcotics II tried jointly with the murder case. The Government had a right to insist on this joinder because the two cases were related, they covered the same period of time, and the operation of Brown's narcotics conspiracy was the motive for the murder. However, they deferred to Brown's request and consented to try the cases separately. In doing so the Government was mindful of how this court might unfairly turn the court's granting of defendant's request against the Government. Thus the U.S. Attorney stated:

> We are willing to do whatever the defendants want to do. But what we don't want to do is to get whipsawed in the Court of Appeals.

Tr. 5, October 6, 1969.

> We will try the cases any way they want them tried, together or apart.

Tr. 13, October 13, 1969.

Brown elected to try the cases separately, the murder case first, and to delay trial of the Narcotics II conspiracy. The cases were tried exactly as he requested and agreed that they be tried and delayed exactly to suit his requests and *his own delays.* If a case can be dismissed on a claim that speedy trial rights were denied under such circumstances, the court has placed the means of defeating every indictment in the hands of defense counsel. Because the Government was charitable to appellant and his counsel, the public interest gets "whip-sawed in the Court of Appeals" and appellant by the action of this court evades justice.

I accordingly vote to *en banc* the case in order to correct this grievous error and to maintain the uniformity of our decisions.

TAMM, Circuit Judge, joins in the foregoing Statement.